**DESMOND HICKS,**

    **Plaintiff,**

v.                                                                                             Case No. 22-CV-533

**JAMES BORGEN,** *et al.***,**

    **Defendants.**

## ORDER

Summary judgment motions on the merits were originally due on September 29, 2023. Only one defendant, Dr. Karen Ronquillo Horton, filed a motion summary judgment. (ECF No. 25.) Due to various delays and stays while the parties and the court resolved discovery disputes, *pro se* plaintiff Desmond Hicks did not respond to Dr. Horton's motion for summary judgment until October 16, 2024, over a year later. (ECF Nos. 48-50.) In his response materials, Hicks noted that at the time the relevant events occurred, he was a pretrial detainee. (ECF No. 48 at 7.) Using the Wisconsin Circuit Court Access website, https://wcca.wicourts.gov/, the court confirmed that Hicks indeed was a pretrial detainee at the time.

The court determined that when Dr. Horton moved for summary judgment, she used the Eighth Amendment deliberate indifference to medical needs standard when she should have used the standard for pretrial detainees, which is based on the Fourteenth Amendment. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 350-51 (7th Cir.

2018) (explaining that an objective reasonableness standard applies to claims brought by pretrial detainees while a deliberate indifference standard applies to claims brought by prisoners). As such, on March 10, 2025, the court denied Dr. Horton's motion for summary judgment without prejudice and invited *all* parties to move for summary judgment on the merits by May 10, 2025. (ECF No. 52.)

Dr. Horton and nurses Marie Brenner and Michelle Robbins (the Medical Defendants) filed motions for summary judgment on the Fourteenth Amendment claims that they were objectively unreasonable in treating Hicks's pain after his surgery. (ECF Nos. 54, 61.) These motions are fully briefed and ready for a decision.

The court notes that the security officer defendants—James Borgen, Tyler Broderick, Kelly Schoebel, Lance Penn, and Casey Gigstead did not move for summary judgment on the First Amendment retaliation claim against them. The court will set a status conference at a later date to discuss next steps regarding the retaliation claim.

**PRELIMINARY MATTERS**

At the outset, the court needs to address the scope of the case. All parties have devoted much of their argument to whether the defendants treated the plaintiff's MRSA infection with objective unreasonableness. However, as Judge J.P. Stadtmueller[1] noted in his screening order, in his complaint Hicks alleges "that he has suffered chronic pain following a surgical procedure and that Ronquillo-Horton,

---

[1] After screening, this case was subsequently reassigned to this court based on the parties consenting to the jurisdiction of a magistrate judge.

Robbins, and Brenner denied him care to address his pain. He alleges that he suffered needless pain for many months following his surgery." (ECF No. 8 at 4.) Based on these allegations, Hicks was allowed to proceed on claims against the Medical Defendants. The only mention of MRSA in the complaint is the allegation stating, "Later, MRSA had settled in Plaintiff's left leg of which makes it difficult for him to walk today." (ECF No. 1 at 3.) There are no allegations that the medical defendants failed to treat his MRSA infection or that their actions (or inaction) caused Hicks's MRSA infection.

Hicks is limited to the scope of the screening order, which is a claim regarding the Medical Defendants' failure to treat his pain following the surgery. *See Werner v. Hamblin*, Case No. 12-C-0096, 2013 WL 788076 at *2 (E.D. Wis. March 1, 2013). As such, the court will disregard and allegations, facts, or arguments, related to treating Hicks's MRSA, and focus on whether the defendants' actions in treating (or failing to treat) Hicks's pain amounts to objective unreasonableness. To the extent that the court discusses Hicks's MRSA infection, it is only to give context to the circumstances regarding his post-surgical pain. In the same vein, the court will also disregard and arguments or allegations about the delay in Hicks's surgery.

Dr. Horton also argues that Hicks failed to follow Federal Rule Civil Procedure 56 and Civil Local Rule 56 when responding to her motion for summary judgment, District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

3

While Hicks's submissions do not formally conform with the rules, his response contains sufficient facts, allowing the court to rule on Dr. Horton's summary judgment motion. Hicks submitted a sworn declaration, swearing to his version of the events. (ECF No. 71.) Hicks also invokes 28 U.S.C. § 1746 in his complaint, which is enough to convert the complaint into a declaration for the purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). As such, the court will consider the information contained in Hicks's submissions where appropriate in deciding the summary judgment motions.

## FACTS

At all times relevant, Hicks was a pretrial detainee at Fond Du Lac County Jail (FJC). (ECF No. 56, ¶ 1.) Dr. Horton provided medical services to prisoners at FJC through Advanced Correctional Healthcare. (*Id.*, ¶ 3.) Nurses Robbins and Brenner were employed as nurses at FJC. (ECF No. 63, ¶ 1.)

*Dr. Horton's Treatment of Hicks's Post-Surgical Pain*

On May 21, 2019, Hicks had "revision reconstruction surgery on his left quad tendon at Froedert Hospital in Milwaukee, Wisconsin." (ECF No. 56, ¶ 9.) He returned to FJC on May 22, 2019, and Dr. Horton "ordered that Mr. Hicks be placed in a camera cell with an extra mattress, [and] two extra pillows to prop up his left leg." (*Id.*, ¶ 10.) Hicks does not dispute that Dr. Horton ordered the extra mattress and pillows, but states that FJC staff never gave him these items. (ECF No. 70, ¶ 10.) It is undisputed that Dr. Horton also prescribed Hicks "Tramadol 50 mg twice daily

4

for three days for pain instead of Acetaminophen with Codeine, per FCJ's policy, Aspirin 325 mg once daily for the next thirty days, and ibuprofen 800 mg twice daily for ten days." (ECF No. 56, ¶ 10; ECF No. 70, ¶ 10.) Hicks, however, asserts that he should have been given the Tylenol with Codeine as prescribed by his surgeon, Dr. Raasch, and that Dr. Horton should have made an exception to FCJ's policy disallowing Tylenol with Codeine because Hicks does not have any history of drug abuse. (ECF No. 70, ¶ 10.) Dr. Horton also "ordered ice packs every two hours as needed, a leg stocking and knee brace if approved by security, and the use of crutches for walking short distances and a wheelchair for longer distance for the next seven days." (ECF No. 56, ¶ 11.)

On May 28, 2019, nursing staff (it does not appear Robbins or Brenner were involved) called Dr. Horton to discuss Hicks's complaints of pain. (ECF No. 56, ¶ 12.) As a result of that call, Dr. Horton ordered Tylenol Extra Strength 500 mg to take twice daily for 30 days and made arrangements to have Hicks's wound dressing reinforced. (*Id.*)

On May 29, 2019, Dr. Raasch, via a "FCJ outpatient consult form" noted "that Mr. Hicks's incision looked good, that steri strips were to be left on for five to seven days, the brace was to be worn for three more weeks and opened up for motion, and no physical therapy for another three weeks then at a frequency of two times per week for three weeks." (ECF No. 56, ¶ 13.)

On May 30, 2019, Dr. Horton was informed that the day before, Hicks's incision site was bleeding. (ECF No. 56, ¶ 14.) She authorized Hicks to be taken to St. Agnes

5

Hospital's emergency department for the incision to be patched up. (*Id.*) Sometime later, Dr. Horton reviewed the nursing notes that were drafted on June 3, 2019, describing video footage from May 29, 2019, which stated that there was camera footage that "showed Mr. Hicks had continually walked bearing full weight on his left knee; that he touched his left knee area four times within the tape footage; that he lifted his leg and 'stomped' it on the bed; and that he leaned on his upper left thigh with his full upper body pushing toward his left knee." (*Id.*, ¶ 15.) Hicks asserts that Brenner was one of the nurses involved in reporting the contents of the video to Dr. Horton. (ECF No. 70, ¶ 15.) He also states that the film footage does not show what Brenner described and actually shows that he did nothing wrong. (*Id.*) The video was not submitted as evidence by any party.

On May 30, 2019, Dr. Horton talked to Hicks at the front of his cell. (ECF No. 56, ¶ 16; ECF No. 70, ¶ 16.) During that conversation, Dr. Horton states that Hicks "reported 5/10 pain, denied numbness or tingling, and stated that his dressing was bleeding through and that his left knee was swollen." (ECF No. 56, ¶ 17.) Dr. Horton further states that she physically examined Hicks (though Hicks does not recall her ever doing so), and "was able to remove his brace with no apparent discomfort and did not observe any bleeding or seepage through the dressing or ace wrap." (*Id.*, ¶ 18; ECF No. 70, ¶ 18.) After the exam, "Dr. Horton ordered ice twice daily for five days, Tylenol 500 mg twice daily for two weeks, dressing changes as needed with saline solution, Xeroform, and ace wrap and Flexeril for muscle spasms." (ECF No. 56, ¶ 19.) She also "ordered Cyclobenzaprine twice daily for five days, an ice gel pack twice

6

daily for five days; and communicated to the nursing staff that it was important to follow Froedert's orders regarding dressing changes and ice." (*Id.*, ¶ 20.)

Nursing staff examined Hicks on June 1, 2019, changed his dressing and checked his vitals. (ECF No. 56, ¶ 21.) At that appointment, Hicks reported 7/10 pain. (*Id.*) At some later point, Dr. Horton reviewed the nursing notes and "ordered a stat dose of 800 mg ibuprofen and advised to alternate Tylenol and ibuprofen." (*Id.*, ¶ 22.)

On June 5, 2019, Dr. Horton received a call from FCJ security officer Pfingsten informing her that at approximately 9:00 p.m., Hicks "complained of pain in the back of his leg and he felt like his vision was pulsating." (ECF No. 56, ¶ 23.) Dr. Horton ordered 500 mg of extra strength Tylenol and 200 mg of ibuprofen to immediately help with Hicks's pain. (*Id.*, ¶ 24.) Hicks notes that she did so without speaking or evaluating him. (ECF No. 70, ¶ 24.)

On June 6, 2019, nursing staff called Dr. Horton informer her that Hicks "was having 10/10 pain behind his left knee and advised that there was a scant amount of drainage on the ace wrap, the left knee had increased swelling with a dime-sized lump on the back, and that Mr. Hicks was unable to lift the leg with assistance and stability." (ECF No. 56, ¶ 25.) Horton authorized Hicks to be taken to the St. Agnes Hospital emergency department, concerned that he was experiencing a blood clot. (*Id.*, ¶ 26.) She also ordered 800 mg of ibuprofen to be taken twice daily for 14 days. (*Id.*) Hicks asserts that Dr. Horton did not examine him personally until six days later. (ECF No. 70, ¶ 26.)

On June 8, 2019, nursing staff called Dr. Horton because Hicks's "incision was bleeding with a large amount of serosanguineous drainage at the knee incision, and Mr. Hicks reported extreme pain, with spasms to the back of the knee and back pain." (ECF No. 56, ¶ 27.) Dr. Horton had nursing staff clean and redress the incision, and she ordered "Baclofen, muscle rub cream for back pain, and Tylenol with Codeine." (*Id.*, ¶ 28.) On June 10, 2019, Dr. Horton "instructed jail staff to monitor and document if Mr. Hicks was fully non-weight bearing on his left leg per the surgeon's orders and to report anything unusual to the nursing staff." (*Id.*, ¶ 29.) During this monitoring period, security staff "observed Mr. Hicks multiple times each day weightbearing on his left leg, not using crutches, not wearing his brace, not elevating his leg when laying [sic] down in his cell and also was observed cleaning his wound on his own." (*Id.*, ¶ 31.) Hicks states that the FCJ activity log demonstrates that Dr. Horton is mischaracterizing his behavior during the monitoring period. (ECF No. 70, ¶ 31; *see* ECF No. 57-16.) The court notes that the activity log does not demonstrate that Hicks was constantly using his leg and does indicate he was often resting and elevating his leg. However, it also shows that occasionally he was engaging in the activities Dr. Horton described above.

On June 12, 2019, Dr. Horton physically examined Hicks, taking a culture of the drainage at the wound site, and noting that Hicks "reported 6/10 pain, denied fever, stated he was elevating his leg as often as he could, and that he was doing well on his medications." (ECF No. 56, ¶¶ 32-33.) Horton put Hicks on an antibiotic and

ordered Hicks "to continue Tylenol No. 3 [Tylenol with Codeine], ibuprofen, and his other medication." (*Id.* ¶ 34.)

On June 14, 2019, nursing staff was changing Hicks's dressing and noticed drainage, swelling, and blood clotting. (ECF No. 56, ¶ 35.) On June 16, 2019, Hicks's blood culture came back positive for MRSA. (*Id.*, ¶ 37.) Hicks was given a topical antibiotic, and for the next several days, nursing staff and Dr. Horton consulted with Dr. Raasch to address the MRSA infection. (*Id.* ¶¶ 38-44.) While treating the MRSA infection, Dr. Horton extended "ibuprofen and Tylenol No. 3 for another 14 days" and added Gabapentin at 300 mg for 14 days. (*Id.*, ¶ 44.) On June 22, 2019, Dr. Horton increased Hicks's Gabapentin dose for 300 mg twice daily for 14 days. (*Id.*, ¶ 46.) On June 30, 2019, after being notified that Hicks missed his Tylenol No. 3 dosage, Dr. Horton immediately authorized Hicks to receive that dose. (*Id.*, ¶ 48.)

On July 1, 2019, Dr. Horton consulted with medical staff at Froedert, who advised a reduction in icing; using Codeine only at night; wearing the brace at all times; elevating the leg, and remain non-weightbearing. (ECF No. 56, ¶ 48.) Dr. Horton ordered that Hicks "must wear his knee brace at all times, remain nonweightbering, ice as needed, and to lock the brace when transferring." (*Id.*, ¶ 49.) On July 5, 2019, Dr. Horton extended Hicks's ibuprofen and Tylenol for another two weeks. (*Id.*, ¶ 50.)

On July 16, 2019, Dr. Raasch treated Hicks's MRSA infection at Froedtert hospital, and Hicks remained in the hospital for three days. (ECF No. 56, ¶¶ 51-53.) After his discharge, Dr. Horton ordered "ibuprofen, ice for two weeks, Tylenol No. 3

9

with Codeine up to four times daily for two weeks, and then one tablet daily for two weeks." (*Id.*, ¶ 55.)

From then on, Hicks's MRSA infection was resolving, and he was regaining use of his leg. (ECF No. 56, ¶¶ 56-59.) Throughout August and September 2019, Horton was consistently ordering ice for Hicks, especially after physical therapy. (*Id.*, ¶¶ 60-61.) By October 2019, Hicks was off crutches, his incision was completely healed, and he had mobility in his left leg. (*Id.* ¶¶ 62-63.) Dr. Horton last saw Hicks for this issue on November 21, 2019, where she ordered that Hicks could have Tylenol for his knee pain. (*Id.*, ¶ 64.)

*Robbins and Brenner's Treatment of Hicks's Pain*

Neither Hicks nor Robbins and Brenner provide substantial details regarding their treatment of Hicks. Robbins and Brenner state that their treatment was limited to the following:

- Failure to take Hicks's blood pressure at some point, unclear in the record when;

- Failure to properly change soiled bandages, unclear in the record when and how often;

- Cancelling ice orders, unclear in the record when and how often;

- Changing his pain prescriptions, unclear what prescriptions and how they changed them and when;

- Placed him in a dirty medical cell, unclear from the record when and what the conditions were.

(ECF No. 63, ¶ 4.) Hicks does not elaborate or respond to Robbins and Brenner's assertions. At most, he accuses Brenner of improperly instructing him on how to care

10

for his wound, (ECF No. 70, ¶ 49) and lying in her reports regarding keeping off his leg, (*Id.*, ¶ 15).

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'"

11

*Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Hicks claims that the Medical Defendants violated his Fourteenth Amendment rights when they were objectively unreasonable in treating his post-surgical pain. To demonstrate a claim under the Fourteenth Amendment's due process clause, a plaintiff must allege that (1) "he suffered from an objectively serious medical condition" and (2) "the staff's response to it was objectively unreasonable." *Williams v. Ortiz*, 937 F.3d 936, 942-943 (7th Cir. 2019). To assess objective unreasonableness, the "standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief—whether the response was reasonable." *McCann. Ogle Cty. Ill.,* 909 F.3d 881, 866 (7th Cir. 2018).

At the outset, as to Robbins and Brenner, Hicks fails to provide any evidence that they treated his pain with objective unreasonableness. At most Hicks provides vague allegations that their treatment was subpar, but he does not provide any details such as when they treated him, what they did or did not do, and how they failed to treat his pain. At most, he asserts that Brenner mischaracterized what the May 29, 2019 video showed in her report, but that does not speak to how she treated his pain. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d

12

969, 973 (7th Cir. 2020). "It is therefore incumbent on the party opposing a summary judgment motion to 'inform the district court of the reasons why summary judgment should not be entered'" *Reed v. Brex, Inc.*, 8 F. 4th. 569, 578 (7th Cir. 2021) (quoting *Riely v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)). With regard to Robbins and Brenner, Hicks has failed to do so. As such, no reasonable factfinder could conclude that they acted with objective unreasonableness. Summary judgment is granted in their favor.

Regarding Dr. Horton, no reasonable factfinder could conclude that she treated Hicks's post-surgical pain with objective unreasonableness. Hicks's main argument is that she did not immediately follow his surgeon Dr. Raasch's pain medication recommendation—specifically prescribing him Tylenol with codeine. However, it is not objectively unreasonable for a medical professional to exercise her judgment and proceed with caution before introducing an opioid like codeine into a prison setting. *See Myrick v. Gohde*, Case No. 17-cv-603, 2020 WL 5074411 at * 22 (W.D. Wis. Aug. 27, 2020) (finding that medical professionals should consider security concerns when introducing opioids into a prison setting). Also, within 3 weeks, on June 8, 2019, Dr. Horton responded to Hicks's many complaints of pain by prescribing him Tylenol with codeine, and she continued to renew the prescription until it was clear in the fall of 2019 that Hicks's MRSA infection cleared up and he was mostly healed from his surgery. Further, during that entire time, almost weekly, Dr. Horton would try different combinations of pain medications to address his pain. She also twice sent him to the emergency room and ordered extra pillows, mattresses, and regular ice. If

13

Hicks did not receive these items from security staff, that is not Dr. Horton's fault. She cannot be held liable for the failures of others. *See Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir. 2009) (Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's.").

Additionally, when Hicks continued to complain of pain, less than a month after his surgery and approximately a week after she prescribed him Tylenol with codeine, she put him on gabapentin. While not an opioid, gabapentin is often associated with dependence and abuse and therefore is generally restricted or not allowed in the prison setting. In short, no reasonable factfinder could conclude that trying less risky medications and other methods of pain relief for three weeks after Hicks's surgery was objectively unreasonable. Summary judgment is granted in favor of Dr. Horton.

## CONCLUSION

For the foregoing reasons, the court grants the Medical Defendants' motions for summary judgment. The First Amendment retaliation claim against the security officers still remains. As such, the court will set a scheduling conference at a later date to discuss next steps.

**IT IS THERFORE ORDERED** that Dr. Horton's motion for summary judgment (ECF No. 54) is **GRANTED**. Dr. Horton is **DISMISSED.**

**IT IS FURTHER ORDERED** that Robbins's and Brenner's motion for summary judgment (ECF No. 61) is **GRANTED**. They are **DISMISSED**.

14

The clerk is directed to set this matter on the calendar for a telephonic status conference.

Dated in Milwaukee, Wisconsin this 20th day of January, 2026.

STEPHEN DRIES
United States Magistrate Judge